**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| KIRK ROSS ENGLE, | § | |
| (TDCJ-CID #2051545) | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. V-18-0008 |
| | § | |
| LORIE DAVIS, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM AND OPINION**

Petitioner, Kirk Ross Engle, seeks habeas corpus relief under 28 U.S.C. § 2254, challenging

a conviction in the 24th Judicial District Court of DeWitt County, Texas. Respondent filed a motion

for summary judgment and copies of the state court record. Engle has filed his response. The

threshold issue is whether Engle has presented meritorious grounds for federal habeas corpus relief.

Based on the pleadings, the motions and briefs, the record, and the applicable law, the Court grants

Respondent's motion, denies Engle's petition, and enters final judgment dismissing the case by

separate order. The reasons for these rulings are set out below.

**I.      Background**

A jury found Engle guilty of the felony offense of aggravated assault with a deadly weapon.

(Cause Number 15-11-12,329). The court found to be true three enhancement paragraphs relating

to prior convictions for retaliation in Cause Number 98-7-9112, escape and repeat felony offender,

Cause Number 07-10-10,704, and driving while intoxicated, third or more offense, Cause Number

07-10-10,703. On February 11, 2016, the court sentenced Engle to forty years imprisonment. The Thirteenth Court of Appeals of Texas affirmed Engle's conviction on January 19, 2017. The Texas Court of Criminal Appeals refused Engle's petition for discretionary review on May 24, 2017. Engle filed an application for state habeas corpus relief on September 18, 2017, which the Texas Court of Criminal Appeals denied without written order on January 3, 2018.

On February 2, 2018, this Court received Engle's federal petition. Engle contends that his conviction is void for the following reasons:

(1)    the trial court erred in prohibiting him from conducting a complete defense by limiting his expert's testimony on insanity;

(2)    trial counsel, Brent Dornburg, rendered ineffective assistance by failing to object when the State's witnesses commented on his post-arrest silence;

(3)    the trial court and the prosecutor interfered with his right to a defense, thus denying him his right to counsel;

(4)    appellate counsel, Luis A. Martinez, rendered ineffective assistance by failing to challenge on appeal testimony and jury argument commenting on Engle's post-arrest silence; and

(5)    the prosecutor engaged in misconduct by referring to Engle's post-arrest silence.

## II.    The Applicable Legal Standards

This Court reviews Engle's petition for writ of habeas corpus under the federal habeas statutes, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U.S.C. § 2254; *Woods v. Cockrell*, 307 F.3d 353, 356 (5th Cir. 2002); *Nobles v. Johnson*, 127 F.3d 409, 413 (5th Cir. 1997), citing *Lindh v. Murphy*, 521 U.S. 320 (1997).

Sections 2254(d)(1) and (2) of AEDPA set out the standards of review for questions of fact, questions of law, and mixed questions of fact and law that result in an adjudication on the merits. An adjudication on the merits "is a term of art that refers to whether a court's disposition of the case is substantive, as opposed to procedural." *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir. 2000). A state-court determination of questions of law and mixed questions of law and fact is reviewed under 28 U.S.C. § 2254(d)(1) and receives deference unless it "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." *Hill v. Johnson,* 210 F.3d 481, 485 (5th Cir. 2000). A state-court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result. *Williams v. Taylor,* 120 S. Ct. 1495 (2000). A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 1495. Questions of fact found by the state court are "presumed to be correct . . . and [receive] deference . . . unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hill,* 210 F.3d at 485 (quoting 28 U.S.C. § 2254(d)(2)).

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman,* 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes*

*v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005) and 28 U.S.C. § 2254(e)(1)). This deference extends not only to express findings of fact, but to the implicit findings of the state court as well. *Garcia*, 454 F.3d at 444-45 (citing *Summers v. Dretke*, 431 F.3d 861, 876 (5th Cir. 2005); *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004)).

While, "[a]s a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases," *Clark v. Johnson,* 202 F.3d 760, 764 (5th Cir.), *cert. denied,* 531 U.S. 831 (2000), the rule applies only to the extent that it does not conflict with the habeas rules. Section 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary rule that, in a summary judgment proceeding, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless the petitioner can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *Smith v. Cockrell,* 311 F.3d 661, 668 (5th Cir. 2002).

Engle is proceeding pro se. A pro se habeas petition is construed liberally and not held to the same stringent and rigorous standards as pleadings filed by lawyers. *See Martin v. Maxey,* 98 F.3d 844, 847 n.4 (5th Cir. 1996); *Guidroz v. Lynaugh*, 852 F.2d 832, 834 (5th Cir. 1988); *Woodall v. Foti,* 648 F.2d 268, 271 (5th Cir. Unit A June 1981). This Court broadly interprets Engle's state and federal habeas petitions. *Bledsue v. Johnson,* 188 F.3d 250, 255 (5th Cir. 1999).

## III. Statement of Facts

### A. State's Opening Argument

Mr. Michael Sheppard, counsel for the State, gave an opening statement. He asked the jury to focus on the evidence and consider whether the defendant, Kirk Ross Engle, knew that what he did was wrong. III RR 11. He said:

> Because the insanity issue is so prominent in this case, I'm going to
> ask you to keep your eye on that ball and to focus, as you hear the
> evidence, on what is the critical issue and the critical evidence that
> you need to consider to determine whether or not this defendant knew
> what he did was wrong . . .

III RR 11. Sheppard anticipated that the evidence would show that Engle consciously and deliberately stabbed the victim while asking, "Do you want to die tonight?" III RR 13-14. Engle committed the stabbing, according to Sheppard, so that he could go back to prison. III RR 12-13. Engle then fled the scene and got rid of the knife, an act showing Engle knew the act was wrong. III RR 14-15. Sheppard alerted the jury that police captured Engle on tape talking about going "home," which was prison and that Engle's original plan was to stab the fire chief and not Brian Smolik. III RR 16. Sheppard also noted that Engle would not tell officers his name but then corrected the spelling of his last name to those same officers. III RR 17-18. Sheppard told the jury that Ranger Troy Wilson would testify and say that Engle initially told him that Engle committed the stabbing so he could go back to prison. III RR 18-19. The State believed that Engle's statement that the stabbing was his way of going back to prison reflected on his mental state. III RR 19. Sheppard anticipated that Engle would try to blame his prescription for Lexapro for his insanity. III RR 19. The medical records, though, would show that Engle was "pissed off" at police and used rage "as an excuse to get violent." III RR 19-20. Sheppard alluded to medical records indicating that Engle told

caseworkers that he was "homesick for prison" and that he wanted "to kill a cop." III RR 20. Sheppard also told the jury that Dr. Joel Kutnick, a psychiatrist, would testify and say that Lexapro did not produce insanity. III RR 20-21.

## B. State's Case-in-Chief

The State's first witness was the victim, Brian Smolik. On August 19, 2014, Smolik, a volunteer firefighter at Yorktown Volunteer Fire Department, went to respond to a fire around 8:30 or 8:45 in the evening. III RR 25, 27. Smolik testified that he was initially paged to respond to a car fire at an apartment building, but that the fire ended up being a brush fire on 6th Street. III RR 25. He arrived at the scene in a red fire truck with lettering on the side identifying the Yorktown Volunteer Fire Department. III RR 30. The truck's lights and siren were both running. III RR 32. Smolik testified that when he arrived at the scene, a man, the defendant Engle, was standing behind the fire. III RR 26. The fire was made of brush and tree limbs and appeared to contain an old couch. III RR 27. It was dark. III RR 28. Smolik explained to Engle that he was with the Volunteer Fire Department and that they would need to put the fire out because it was within the city limits. Engle responded with comments along the lines of "F**k the fire department" and "F**k the police department." III RR 29. Smolik testified that he climbed on the back of the truck to turn the pump on. As he did, Engle told Smolik that he had started the fire on purpose and that Smolik was not going to put it out. III RR 26. Smolik testified that Engle said at least twice that he did not want the fire department to put the fire out. III RR 30. Smolik told Engle that the firefighters had to put the fire out and started the pump. He then turned to the right to get off the truck. As he did, he felt like he had been punched in the stomach. III RR 26.

6

When Smolik got off the truck, Mylam Lemke, another volunteer firefighter, told him he was bleeding, and Smolik realized he had been stabbed. III RR 26. Lemke testified that he heard Engle say to Smolik, "Do you want to die tonight?" III RR 45. Eric Von Helbing, another volunteer firefighter, testified that he saw Engle holding a knife and making a jabbing motion toward Smolik. III RR 39. Monte James Riedel, another volunteer firefighter, testified that Engle swung his hand in the air and asked Riedel, "You want to get stabbed tonight, too?" Riedel put his hands up and started yelling, "He's got a knife, call the police." III RR 49. Von Helbing called EMS and the police department. III RR 40. He also saw Engle leave the scene. III RR 41. Lemke walked Smolik to Main Street, where an ambulance could pick him up. III RR 33. Smolik testified that he did not see Engle again. III RR 29. Smolik then spent four days in the Detar Hospital in Victoria, Texas. III RR 28. He spent three days in the ICU and one in a private room. III RR 33.

Officer Joshua James Serbin testified that he was responding to a call about a domestic situation when police Chief Campos told him that he needed to respond to Smolik's stabbing. III RR 53. Once he arrived at the scene, Serbin began to search for Engle. III RR 54. He found Engle about eight blocks from the fire. Serbin testified that he told Engle to stop where he was, and Engle put his hands in the air. Serbin's gun was drawn. III RR 55. Serbin commanded Engle to walk slowly toward him and when he began walking fast, Serbin told him to turn around and lay on the ground. Engle complied after Serbin gave him the command seven times. III RR 56. Serbin called dispatch, and Chief Campos arrived shortly thereafter. Chief Campos and Serbin put handcuffs on Engle, and when a third officer arrived at the scene, the officers searched Engle's person for weapons. They did not find a knife on him or around him. III RR 57. Serbin testified that Engle told the officers that he had been waiting for Chief Campos, because he had wanted to stab him. Engle further stated that he

wanted to go home. Chief Campos told Engle that he would not be going home, and Engle then clarified saying the penitentiary was his home. III RR 59. Serbin testified that, during the ride in the car to the jail, Engle told Chief Campos that he had a hard time making it outside of prison and that when he was previously up for parole, he told the officials that he did not want to get out of prison. Engle also stated in the car that Smolik had been in the wrong place at the wrong time. III RR 62.

After Serbin's testimony, the State offered the State's Exhibit 4, an hour-long video from Officer Serbin's dash cam from August 19, 2014, showing Engle's arrest. III RR 63, 66. In the video, Serbin said that Engle would be charged with a federal offense. Engle responded, "They feed me better." III RR 79. Engle also commented that prison was where he belongs. III RR 83.

Officer Troy Wilson, a Texas Ranger, testified next. He said that he spoke with Engle at the Dewitt County Sheriff's Office. III RR 86. Wilson testified that Engle told him that he took medication and that he had told his counselors he wanted to go back to prison. III RR 87. Wilson testified that after he read Engle his *Miranda* rights, "the 38.22 warnings," Engle terminated the interview. *Miranda v. Arizona,* 384 U.S. 436 (1966); Tex. Code Crim. Proc. art. 38.22, 2(a) (West 2014). III RR 87-88. The State offered Exhibit 5, an audio recording of Wilson and Engle's conversation. III RR 88. The prosecutor asked Ranger Wilson, "What did he say?" in discussing Engle's responses to the *Miranda* questions. III RR 91. Ranger Wilson said that Engle said, "I plead the Fifth" and "terminate." III RR 91. Ranger Wilson also noted that Engle nodded his head in the affirmative in response to the question regarding whether he understood the *Miranda* warnings. III RR 91.

## C. Defense Opening Statement

In his opening statement, Mr. Brent Dornburg, defense for Engle, stated that at the time of the incident, Engle had been on parole for a felony offense. Engle's parole officer sent him to Gulf Bend to be evaluated, and there he was found to have several mental illnesses. He was prescribed medications included Lexapro and Seroquel. Dornburg stated that Engle took Lexapro during the day and Seroquel at night to help him sleep. Dornburg stated that Lexapro caused Engle to behave in ways he normally did not behave and made him angry and irritable. IV RR 8. Dornburg stated that by preponderance of the evidence, he would attempt to prove that Engle was insane. IV RR 7.

## D. The Defense's Case-In-Chief

Brandi Gamez, a nurse at the Dewitt County Jail, testified that the medical records from the jail, presented as Defense Exhibit Number 1, showed that Engel's dose of Lexapro was 20 milligrams per day, and his dose of Seroquel was 200 milligrams at night. IV RR 12. She also testified that the record showed that Engle had refused the medicine. IV RR 13.

Engle testified next, waiving his Fifth Amendment protection. IV RR 17. Engle testified that as he remembered, on the night of the incident, he was on parole after serving most of a 5-year sentence in prison for a DWI and resisting arrest. IV RR 21. Engle testified that he has had mental problems since he was young and dropped out of school because of them. He testified that he self-medicated with drugs and alcohol to deal with his mental problems, which were causing him to have blackouts, anger, depression, and suicidal thoughts. IV RR 22. Engle testified that he held several jobs but then started smoking marijuana with his cousin and had a dirty urine test. IV RR 23. Because of his urine test, his parole officer sent him to a crisis center in Gulf Bend. IV RR 24. At the time he was sent to the crisis center, he testified that he was becoming suicidal, going into rages,

9

and cussing his family out and not remembering it. IV RR 24-25. He testified that he told his parole officer that he thought people were after him and trying to kill him. IV RR 25. Engle testified that the doctor at Gulf Bend talked with him no longer than five minutes before writing a prescription for him. Engle testified that the doctor later increased his prescriptions for both Seroquel and Lexapro, although he only requested an increased dosage of the sleeping pills. Engle testified that he started acting out of anger and not remembering it after the increased dosage of Lexapro. IV RR 27. Engle testified that he stopped taking Lexapro for three weeks but that his parole officer instructed him that he needed to have Lexapro in his blood system for his urine test and that he would be in violation of his parole if he did not take it. He was on Lexapro the night of the incident. IV RR 28.

Engle testified that on the day of the incident, he had cleaned out a house he had been renting out to people and threw some furniture in a ditch for the city to pick up. Engle said that he started feeling angry and then saw a fire but did not remember lighting it. He said that he started to go get some water but then blacked out. IV RR 29. The next thing he remembered was laying in the street and then seeing his friend's house and starting to walk toward it. He testified that, after that, the next thing he remembered is waking up in jail three days later. IV RR 30. Engle said that he did not remember stabbing a fireman but saw it on TV and in the newspaper. IV RR 32. Engle said, on cross-examination, that he had been to penitentiary on three prior occasions, including for threatening a police officer. IV RR 33-34. He testified that he went to federal penitentiary for hauling 12 pounds of marijuana. He testified that he knows that the federal penitentiary serves better food than the state penitentiary. IV RR 34. Engle admitted that Officer Campos would be a likely target if he wanted to kill someone. IV RR 47. Engle said that his previous rage attacks in which he

assaulted or threatened officers were due to alcoholism, not Lexapro. Engle testified that he was not drinking with his friend Carlos Villarreal on the day of the incident. IV RR 51. Engle said that he had been telling people he wanted to go back to the penitentiary. IV RR 52. Engle also testified that he told Dr. Dotter, his doctor at Gulf Bend, that he suffered from depression, anxiety, anger, and paranoia. IV RR 65. He also told Dr. Dotter that he had rage attacks. IV RR 67. Engle said that he only wanted his sleeping medicine increased when Dr. Dotter increased both Lexapro and Seroquel. IV RR 69.

Engle testified that he did not remember much of the day of the incident and much of what was recorded on video and being shown to the jury. IV RR 71. Engle said that he did not know where he had put the knife. IV RR 76. Engle testified that he heard on the video of his conversation with Texas Ranger Troy Wilson that he said, "This is what it took" for him to go back to prison but did not remember it. IV RR 89. Engle said that he took Lexapro in jail and that he started acting weird as soon as he took it. IV RR 91. Engle said that on the day of the incident, however, he remembered having a conversation about buying a house with his friend and neighbor Carlos Villarreal, soon after taking Lexapro. IV RR 93. Engle testified that on July 14, 2014, he told Mickey Kenney, a counselor at Gulf Bend, that he would rather be in prison than in the free world. Engle testified that he did not remember, however, when he was two days off his medication, telling Mr. Kenney that he wanted to kill a cop because they are the enemy. IV RR 100. On re-direct, Engle said that he did not remember stabbing Mr. Smolik. IV RR 103.

Nancy Mecina Hosek, a corporal at DeWitt County Jail, testified that she sometimes administered medications if the nurse was not at the jail in the evening shift or if she was working the evening shift. IV RR 104. Hosek said that she sometimes provided medication to Engle but that

she did not remember what. Hosek testified that she sometimes assisted the weekend nurse in distributing medications as well. IV RR 105. Hosek said that Esther, the weekend nurse, distributed medication to Engle and that 40 minutes later, he became agitated and started pacing in his cell. IV RR 106. Hosek said that Engle demonstrated anxiousness for about six hours that day and that she told him he did not have to take the medication anymore. IV RR 106-107. Hosek said that she did not see him act anxious after refusing to take the medication. IV RR 107. On cross-examination, Hosek testified that six hours after taking the medication, Engle started to get exhausted and then fell asleep. IV RR 109.

Lupe Garcia, Kirk Engle's mother, testified that Engle started taking medications in April of 2014 and that she took him to Gulf Bend for mental services. IV RR 113-114. Garcia said that Gulf Bend mailed the medications for Engle to her house and that Engle's behavior began to change after he started taking them. Garcia said that he would cry, became more forgetful, and would tell her to go away when she knocked at his door. IV RR 114. Garcia said that Engle started treating her inappropriately after being on the medicine and texted her things like, "I'm going to kick your ass" or come to her house and say things like, "You're not my mom." IV RR 115. Garcia said that Engle was always forgetful but not angry, crying or depressed. IV RR 116. On cross-examination, Garcia testified that she took Lexapro to the jail about a week after Engle had been admitted because he did not want to see her any day prior. IV RR 118. Garcia agreed that Engle seemed to be acting the same way he acted when he was off Lexapro. IV RR 119.

Dr. Thomas Demoor, a psychiatrist from San Antonio, testified that he approaches cases of criminals seeking psychiatric help differently than other patients because he is looking for confirmatory evidence. Dr. Demoor said that in order for a person to be not guilty by reason of

insanity, the person needs to have such severe mental illness that they can no longer tell right from wrong. Dr. Demoor said that he did not examine Engle for criminal insanity. IV RR 122. Dr. Demoor said that he examined Engle for a condition known as "involuntary intoxication " and that he believed Engle suffered from involuntary intoxication due to his medication and that it led to a manic state and his aggressive outburst. IV RR 123. Dr. Demoor said that it was debatable whether Engle should have been prescribed Lexapro, since he believes Engle suffered from bipolar disorder. IV RR 124. On recess, the judge said that Dr. Demoor could not talk about whether Engle knew whether what he was doing was right or wrong, since he did not examine Engle for insanity. IV RR 125. Dr. Demoor said that he reviewed medical records from the MHMR, witness statements, offense reports, and Dr. Kutnick's reports. IV RR 127.

### E. The State's Rebuttal

The State called Dr. Joel Kutnick, a self-employed psychiatrist who has conducted thousands of forensic evaluations. Dr. Kutnick testified that in contrast to clinical psychology (in which he generally takes a client at his word), forensic psychology requires him to obtain collateral information to determine whether a client is telling the truth about his condition. IV RR 131-132. Dr. Kutnick testified that in conducting a forensic evaluation, he is looking to see whether a defendant is competent, whether the insanity defense might be applicable, and whether there were mitigating circumstances. IV RR 132-133. Dr. Kutnick said that he was asked to analyze Engle for sanity. IV RR 134. Dr. Kutnick said that he was asked to determine whether Engle was insane, regardless of intoxication. IV RR 139. Dr. Kutnick said that in his investigation, he discovered that Engle may have been drinking the day of the assault and that Engle had abused alcohol in the past. IV RR 141. Dr. Kutnick testified that, based upon the records, it did not appear that Engle had

complained that Lexapro had been causing him problems. IV RR 142. Dr. Kutnick read part of a diagnostic assessment from November 22, 2013 (State's Exhibit 7), in which Engle said he sometimes got into a rage stage and used it as an excuse to become violent. The report was from before Engle was put on Lexapro. IV RR 144. Dr. Kutnick also read part of a psychiatric evaluation conducted by Dr. Dotter at the Gulf Bend MHMR Center from March 5, 2014 (State's Exhibit 11), which was also before Engle was on Lexapro. The evaluation mentioned that Engle complained of depression, anxiety, anger, and paranoia. IV RR 145-146. Dr. Kutnick also read an Individual Service Record (State's Exhibit 9), handwritten by Dr. Kinney of Gulf Bend Center and dated January 13, 2014, that said that Engle stated he was homesick for prison. The conversation happened before Engle was put on Lexapro. IV RR 147. Dr. Kutnick testified that he did not see anything about Engle complaining about his medications in all of the records he reviewed. IV RR 148. Dr. Kutnick testified that a person's behavior before, during, and after a crime is one of the most important things in determining a person's sanity. Dr. Kutnick said that there is a very narrow definition for insanity, which is that a person must be so ill that he or she does not know that what they are doing is wrong. IV RR 149. Dr. Kutnick testified that based upon the facts in evidence and everything he reviewed, his opinion was that Engle was not insane at the time he committed the crime.

Dr. Kutnick testified that Lexapro is a common drug prescribed for anxiety and depression and that he has never seen or heard of it causing a blackout. IV RR 151. Dr. Kutnick testified that Lexapro can cause people with bipolar disorder to go into a manic state but that there was no evidence of that in Engle's case. IV RR 152-153. Dr. Kutnick testified that in his opinion, based on a reasonable degree of medical certainty, Engle was not intoxicated on Lexapro when he stabbed

Smolik. He also said that Engle might have been intoxicated by alcohol but that no one had tested his blood or urine after he was arrested. IV RR 156-157. Dr. Kutnick read a note from Gulf Bend MHMR (State's Exhibit 8), dated July 14, 2014, when Engle had been off Lexapro for two days, that said Engle had stated he wanted to kill a cop. IV RR 157. Upon cross-examination, Dr. Kutnick said that he had only a provisional, not a definitive, diagnosis. IV RR 157. Dr. Kutnick testified that Engle was on Seroquel, an antipsychotic and mood stabilizer, and that it would be unlikely for an antidepressant such as Lexapro to push a person into a manic state while that person was also on a mood stabilizer. IV RR 163. Dr. Kutnick said that based on his research on Lexapro, there was a small possibility that the drug could cause an increase in violence but not after age 24. IV RR 164.

Mickey Kinney, a case manager at Gulf Bend, testified that his job responsibilities included teaching individuals to take medication, reminding individuals to take medication, and reminding individuals to keep doctors' appointments and refill their medication. Kinney said that he did that with Engle. IV RR 169. Kinney said that he tried to meet with Engle on a weekly basis at his home. IV RR 170. Kinney said that Engle never complained to him about the effects of his medication between March 2014 (when he started taking Lexapro) and August 19, 2014 (the day of the incident). Kinney said that Engle did not complain about feeling bugs on him or that he felt like the medication was making him crazy or that he could not remember things. IV RR 171.

### F.    The Defense's Rebuttal

On rebuttal, Engle testified that he complained one time about his medication to Kinney. He said he complained that the medication gave him the shakes. Engle said that Kinney told him that he had never seen it do that to him. IV RR 172-173.

## G. The State's First Closing Argument

Mr. Manning began the State's closing. He argued that the State was sympathetic to Engle's background but that that background did not give him license to stab a fireman with a knife. V RR 5. Mr. Manning highlighted some of the evidence presented, including the November 2013 Gulf Bend assessment in which Engle said he would use rage as an excuse to become violent (State's Exhibit 7), the January 14 conversation with Kinney in which Engle said he was homesick for prison (State's Exhibit 9), and the July 2014 conversation with Kinney in which Engle said he wanted to kill a cop and that he had been off Lexapro for two days (State's Exhibit 8). V RR 5-6. Mr. Manning reminded the jury that on August 19, 2014, Engle started a fire, asked Smolik if he wanted to die that night, stabbed Smolik (sending him to the hospital for four days), left the scene because he knew his conduct was wrong, and then hid the knife. V RR 6. Mr. Manning said that Engle denied stabbing anyone during his ride to the jail and that he also stated that Smolik was in the wrong place at the wrong time (State's Exhibit 4). Mr. Manning said that Engle told Texas Ranger Troy Wilson that "This is what it took," referencing going back to prison (State's Exhibit 5). V RR 7. Mr. Manning said that Kinney had said that Engle had not complained about his medications and that both the Defense's expert, Dr. Demoor, and the court-appointed expert, Dr. Kutnick, said that the defendant did not meet the criteria for insanity. V RR 8.

## H. The Defense Closing Argument

In his closing statement, Mr. Dornburg, counsel for Engle, advised the jury to decide what the evidence shows and what burdens were met by either side. V RR 8. Mr. Dornburg walked the jury through the jury charge. He said that the defense did not contest that Engle stabbed Smolik, but that Paragraph 5 of the jury charge talked about the affirmative defense of insanity. V RR 10. Mr.

Dornburg said the issue in this case was whether Engle was insane based upon involuntary intoxication and that the defense bears the burden of proving by preponderance of the evidence more likely than not that he was intoxicated on the day of the offense. Mr. Dornburg submitted to the jury that the defense met its burden. V RR 10. Mr. Dornburg said that Engle exercised no independent judgment in taking his medicine, since it was required by the conditions of his parole. V RR 11. Mr. Dornburg highlighted testimony from Lupe Garcia, Engle's mother, in which she said Engle started acting differently after taking the medication, cursing out family members and forgetting things. Mr. Dornburg highlighted testimony from a jail employee that said Engle went into a rage after taking Lexapro. V RR 12. Mr. Dornburg said that he thought the evidence showed that Engle did not know that stabbing the fireman was wrong at the time he did it, as he has no recollection of the event. V RR 13.

## I. The State's Second Closing Argument

In the final closing statement on behalf of the State, Mr. Sheppard said that it was normal for the jury to have "good Christian sympathy" for Engle but that the deciding factors in the case were what the law is, what the facts are, and what the jury's duties are. V RR 16. Mr. Sheppard said that the incident of Engle stabbing Smolik with a knife was virtually uncontested. V RR 17. Mr. Sheppard said the critical element of the case was whether Engle knew what he did was wrong. Mr. Sheppard told the jury that there was "absolutely zero evidence to support insanity." V RR 18. Mr. Sheppard reviewed the testimony of the firemen with Smolik the night of the incident: Eric Helbing, who saw the knife, and Mylam Lemke, who heard Engle ask Smolik if he wanted to die that night. Mr. Sheppard said the question about dying was legally significant because it showed that Engle knew that stabbing someone could cause death (a blow to the insanity defense). V RR 21. Mr.

Sheppard said that Engle did not want the fire to be put out because he wanted the police officers to show up. Mr. Sheppard says Engle's action was premeditated; he wanted to go back to prison. V RR 22. Mr. Sheppard says that Engle stabbed Smolik because Smolik was interfering with his plan by putting the fire out. Mr. Sheppard reviewed the testimony of Monte Riedel, a firefighter, saying that Engle's threat to him ("Do you want me to stab you?") and that Engle's running off into the darkness were indications that he knew that what he was doing was wrong. V RR 23. Mr. Sheppard said that Engle raised his hands when he encountered Officer Serbin eight blocks from the scene of the crime because he knew that what he had been doing was wrong. V RR 23-24. Mr. Sheppard reminded the jury that Engle told the officers taking him to jail that the penitentiary was his home. Mr. Sheppard said that Engle corrected the spelling of his name, that he said he did not stab anyone, and that Smolik was in the wrong place at the wrong time. V RR 24-25. Mr. Sheppard told the jury that insanity is very narrow and that in Engle's case, the opposite (that Engle was not insane at the time of the incident) had been proven beyond a reasonable doubt. V RR 25. Mr. Sheppard said that Engle's statement that "This is what it took" showed what Engle's mindset and motives were. Mr. Sheppard said that Engle had been talking about going back to prison way before he was ever on Lexapro and had said that he used rage as an excuse to get violent before Lexapro. V RR 26-27. Mr. Sheppard said that he did not think any reasonable juror could believe that Engle remembered everything from the morning and afternoon of the incident but not what happened when he started the fire. V RR 28. Mr. Sheppard told the jury that the Lexapro stuff is "garbage," but even if they find it compelling, they should remember that the fire happened hours after Engle took the Lexapro. V RR 29. Mr. Sheppard also noted that Engle was sane enough to terminate his interview with Texas Ranger Troy Wilson. V RR 29. Mr. Sheppard told the jury that they were there to determine whether

they were going to allow people to stab public servants and be acquitted. V RR 30. Mr. Sheppard said that Engle's testimony did not make sense in that every time he got to a part where he did something bad, he did not remember it. V RR 31. Mr. Sheppard questioned why Engle's family would bring medication that was negatively affecting him to the jail. Mr. Sheppard said that the rage, attacking cops, and the desire to go back to prison predated Engle taking Lexapro. V RR 32. Mr. Sheppard reminded the jury that the experts had said that intoxication had not made Engle insane. V RR 33. Mr. Sheppard asked the jury to find Engle guilty of aggravated assault with a deadly weapon. V RR 35. The jury found Engle guilty of the offense of aggravated assault with a deadly weapon. V RR 38.

## IV.    The Claim Based on Trial Court Error

### (Ground 1)

In his first ground for federal habeas relief, Engle complains that he was denied an opportunity to present a complete defense due to the trial court's ruling limiting his expert witness testimony. Engle states that he clearly asserted the defense of insanity pursuant to Texas Penal Code 8.01 and tried to prove it by asserting involuntary intoxication. Involuntary intoxication is encompassed by the insanity defense found in Texas Penal Code 8.01 and is an affirmative defense. Engle explains that the excluded testimony from Dr. Demoor was relevant and it would have provided helpful and useful information to the jury when assessing Engle's defense and witnesses' testimony. Engle insists that Dr. Demoor's testimony, had it not been excluded, would have proven Engle's defense of being insane. The excluded testimony was therefore critical to the defense. There is a reasonable chance Engle would have been found not guilty had Dr. Demoor been allowed to

testify completely as to both prongs of the involuntary intoxication defense. (Docket Entry No. 18-25, p. 125).

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324 (2006) (internal quotation marks omitted). "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are '"arbitrary" or disproportionate to the purposes they are designed to serve.'" *Id.* (quoting *United States v. Scheffer,* 523 U.S. 303, 308 (1998)). Per that constitutional guarantee, the Supreme Court in *Crane v. Kentucky* held that the state court erred in excluding "competent, reliable evidence bearing on the credibility of [the defendant's] confession" merely because the trial court had ruled the confession voluntary. 476 U.S. 683, 690 (1986); *see id.* at 690–91 ("Th[e] opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing." (internal quotation marks omitted)); *see also Chambers v. Mississippi,* 410 U.S. 284, 302 (1973) ("The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony also was critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."); *Washington v. Texas,* 388 U.S. 14, 23 (1967) ("We hold that the petitioner in this case was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily

denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.").

Yet the general principle announced in *Holmes* and its forebears is complicated when applied in the context of expert witnesses testifying to a defendant's mental health issues. In *Clark,* the Supreme Court confronted a state rule of evidence that excluded all expert testimony regarding the defendant's mental health unless it was offered to prove an insanity defense; i.e., such evidence could not be offered to refute mens rea. 548 U.S. at 756–57. In rejecting the defendant's challenge to that rule, the Supreme Court noted that "the right to introduce relevant evidence can be curtailed if there is a good reason for doing that." *Id.* at 770; *see also id.* ("'While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.'" (alteration in original) (quoting *Holmes,* 547 U.S. at 326)). The Court found four reasons for Arizona's rule that rendered it constitutionally permissible. The first reason was that allowing expert mental health evidence as to mens rea would undermine the state's "authority to define its presumption of sanity (or capacity or responsibility) by choosing an insanity definition, . . . and by placing the burden of persuasion on defendants who claim incapacity as an excuse from customary criminal responsibility." *Id.* at 771. The Court then found three other "characteristics of mental-disease and capacity evidence that may reasonably be hedged by channeling the consideration of such evidence to the insanity issue" on which the defendant generally bears the burden of proof. *Id.* at 774. The

first is that the diagnosis of mental disease "may mask vigorous debate within the profession about the very contours of the mental disease itself," leading to "a general caution in treating psychological classifications as predicates for excusing otherwise criminal conduct." *Id.* at 774–75. The second is "the potential of mental-disease evidence to mislead jurors (when they are the factfinders) through the power of this kind of evidence to suggest that a defendant suffering from a recognized mental disease lacks cognitive, moral, volitional, or other capacity, when that may not be a sound conclusion at all." *Id.* at 775. The last concerns the "particular risks inherent in the opinions of the experts who supplement the mental-disease classifications with opinions on incapacity," namely, the required judgment-calls in making the inference from the diagnosis to an opinion on the defendant's mental state at the time of the offense and from "the concepts of psychology, which are devised for thinking about treatment, to the concepts of legal sanity, which are devised for thinking about criminal responsibility." *Id.* at 776–77. As the rule in question "serve[d] to preserve the State's chosen standard for recognizing insanity as a defense and to avoid confusion and misunderstanding on the part of jurors," there was "no violation of due process under *Chambers* and its progeny, and no cause to claim that channeling evidence on mental disease and capacity offends any principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Id.* at 779 (internal quotation marks omitted).

On habeas review under AEDPA, the prejudice of constitutional error in a state-court criminal trial is measured by the "substantial and injurious effect" standard of *Brecht v. Abrahamson,* 507 U.S. 619 (1993). *See, e.g., Hughes v. Quarterman,* 530 F.3d 336, 345 (5th Cir. 2008).

There are guideposts in applying the standard to the facts of a given case. When a court finds itself "in virtual equipoise as to the harmlessness of the error under the *Brecht* standard, the court

should treat the error as if it affected the verdict." *Fry v. Pliler,* 551 U.S. 112 n.3 (2007) (citations and quotations omitted); *see also Robertson v. Cain,* 324 F.3d 297, 305 (5th Cir. 2003) ("[T]he petitioner should prevail whenever the record is so evenly balanced that a conscientious judge is in grave doubt."). Conversely, an error is insufficient under *Brecht* when the evidence of the defendant's guilt is overwhelming. *See, e.g., Burgess v. Dretke,* 350 F.3d 461, 472 (5th Cir. 2003).

A constitutional trial error is not so harmful as to require habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). It must have had a substantial effect or influence in determining the verdict. Based upon its own careful review of the record, this Court finds that the trial court's decision to exclude the expert testimony of Dr. Demoor did not have a substantial and injurious effect or influence in determining the verdict.

Engle raised this issue on appeal, and the Texas Court of Criminal Appeals subsequently refused Engle's petition for discretionary review. "When one reasoned state court decision rejects a federal claim, subsequent unexplained orders upholding that judgment or rejecting the same claim are considered to rest on the same ground as did the reasoned state judgment." *Bledsue v. Johnson,* 188 F.3d 250, 256 (5th Cir. 1999). This "look through" doctrine enables a federal habeas court "to ignore—and hence, look through—an unexplained state court denial and evaluate the last reasoned state court decision." *Id.; see also Renz v. Scott,* 28 F.3d 431, 432 (5th Cir. 1994) (finding that the denial of relief "on the findings of the trial court" by the Texas Court of Criminal Appeals adopts an express finding by the trial court that a claim was procedurally barred from habeas review); *Ylst v. Nunnemaker,* 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment

rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same

claim rest upon the same ground.").

In this case, the Thirteenth Court of Appeals rejected Engle's trial court error claim. Because

the Thirteenth Court of Appeals issued the last reasoned opinion on this matter, this Court "looks

through" the Texas Court of Criminal Appeals' order to the appellate court's decision.

The Thirteenth Court of Appeals found:

> II. Limitation of Defense Expert's Testimony
>
> In his sole issue, Engle generally complains that the trial court abused
> its discretion when it limited the testimony of his expert, Thomas
> Demoor, M.D., by not allowing him to testify fully and completely
> about an element of the involuntary intoxication
> defense—specifically whether Engle knew that his conduct was
> wrong. Engle contends that by limiting Dr. Demoor's testimony, the
> trial court stopped him from proving his affirmative defense. He
> claims that his constitutional right to due process was violated
> because Dr. Demoor's testimony was "critical to the heart of [his]
> trial defense."
>
> A. Standard of Review
>
> We review a trial court's evidentiary rulings to admit or exclude
> evidence for an abuse of discretion. *See Shuffield v. State*, 189
> S.W.3d 782, 793 (Tex. Crim. App. 2006). A trial court abuses its
> discretion when its decision is arbitrary, unreasonable, or without
> reference to guiding rules or principles. *See State v. Mechler*, 153
> S.W.3d 435, 439 (Tex. Crim. App. 2005). This Court examines the
> trial court's decision in light of what was before the trial court at the
> time the decision was made. *See Weatherred v. State*, 15 S.W.3d 540,
> 542 (Tex. Crim. App. 2000). We will uphold that decision if it is
> reasonably supported by the record and correct under any theory of
> law applicable to the case. *See Willover v. State*, 70 S.W.3d 841, 845
> (Tex. Crim. App. 2002).

B. Applicable Law

Section 8.01 of the Texas Penal Code, which encompasses the defense of insanity due to involuntary intoxication, provides that "it is an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." Tex. Penal Code Ann. § 8.01(a) (West, Westlaw through R.S. 2015); *Mendenhall v. State*, 77 S.W.3d 815, 818 (Tex. Crim. App. 2002). The elements needed to establish an involuntary intoxication affirmative defense include: (1) the accused exercised no independent judgment or volition in taking the intoxicant; and (2) as a result of a severe mental disease or defect caused by the involuntary intoxicant, the accused did not know that his conduct was wrong. *Mendenhall*, 77 S.W.3d at 818; *see Farmer v. State*, 411 S.W.3d 901, 911–12 (Tex. Crim. App. 2013) (Cochran, J., concurring); *Torres v. State*, 585 S.W.2d 746, 749 (Tex. Crim. App. 1979); *see also* Tex. Penal Code Ann. § 8.01(a). "Involuntary intoxication by prescription medicine occurs only when the person has no knowledge that the medicine has possibly intoxicating side effects." *Woodman v. State*, 491 S.W.3d 424, 429 (Tex. App.–Houston [14 Dist.], 2016, pet. ref'd) (citing *Mendenhall v. State*, 15 S.W.3d 560, 565–66 (Tex. App.–Waco 2000), *aff'd*, 77 S.W.3d 815 (Tex. Crim. App. 2002)); *Nelson v. State*, 140 S.W.3d 206, 210 (Tex. App.–Fort Worth 2004, no pet.).

C. Analysis

1. The Trial Court Properly Sustained the State's State-of-Mind Objection

Engle first contends that the trial court abused its discretion when it did not allow Dr. Demoor to opine that Engle "was not able to appreciate right from wrong because of involuntary intoxication." On direct examination, Dr. Demoor provided the following testimony relevant to the State's objection that Dr. Demoor disqualified himself from testifying regarding Engle's state of mind:

Q. Can you tell this jury what procedures you go through in examining someone to determine their legal sanity at the time they committed a crime.

A. Well, legal sanity is a very narrowly defined topic and what some people are used to hearing is called not guilty by reason of

insanity, that might be more familiar to what you've heard. And for somebody to be not guilty by reason of insanity they have to have such severe mental illness that they can no longer tell right from wrong. And it's very few people that are so severely mentally ill that they can't tell right from wrong. To evaluate for that you're trying to assess what actions they did and whether a mental illness caused them to not realize that the actions they did were wrong.

Q. Did you conduct such an examination on Mr. Engle?

A. You know, technically I did not because we were not looking at criminal insanity. I didn't see any evidence to support not guilty by reason of insanity. I wasn't looking for that. I was looking for what we thought of as involuntary intoxication.

. . .

Q. Okay. You had mentioned that you didn't know the straight insanity but then you started to mention involuntary intoxication.

A. Well, that was the question that I was evaluating, yes.

Q. And I think when you reported was insanity, too, for voluntary intoxication?

THE REPORTER: I'm sorry. Would you start again.

Q. Was it your understanding through to involuntary intoxication?

A. I didn't use the term insanity, I did believe he suffered from involuntary intoxication due to his medication and that led to a manic state that caused his aggressive outburst.

Q. And did it lead to a state where he didn't know what he was doing was wrong?

[THE STATE]: I object, Your Honor. The witness has already testified he did not evaluate for that.

THE COURT: Sustained.

A. Can I revise? I mean . . . I looked at the records, I talked to the individual. I didn't know—I didn't notice that he didn't know it

was wrong or whether it was wrong or right, I didn't—I didn't ask that question. He had amnesia for the event so I couldn't really ask what his state of mind was at the time of the event.

. . .

THE COURT: We're going to break for lunch. I'm going to ask that you be back in the jury room, ready to proceed, at 1:25. We'll be in recess until then.

(Jury recessed.)

THE COURT: My understanding . . . is this is a two-prong test. One is was he involuntarily intoxicated and as a result of that involuntary intoxication did he lose an awareness of right and wrong, so this doctor has testified that he didn't evaluate him for losing an awareness of right and wrong. So he can talk about involuntary intoxication but he has very eloquently and honestly said I didn't evaluate him for whether he knew what he was doing was right or wrong. So I can't—we can't go off into that. I want to make sure you understand that. He can no longer testify about whether or not Mr. Engle knew what he was doing and knew whether it was right or wrong. He can talk about whether he was involuntarily intoxicated. . . . But that's where I think we are in the evidence at this point, so I just want to make sure that everybody understood where I think we are and that my rulings are going to be based on that understanding of what the doctor has told me, that he didn't evaluate him for whether or not he was aware of the right or wrong nature of his actions.

. . .

(Open court, defendant and jury present.)

THE COURT: You may be seated. . . .

Q. Doctor, do you remember when we left off you had mentioned involuntary intoxication; is that correct?

A. Yes.

Q. What exactly is involuntary intoxication?

A. In this context involuntary means that he didn't have a choice to refuse to take a substance. Intoxication means that a substance altered his emotional and mental well-being.

Q. And did you see evidence of that in this situation with Mr. Engle?

A. Yes.

Q. Now, back to—you said that you didn't see any evidence of insanity in this case, correct?

A. Well, that I didn't evaluate him specifically.

Q. Okay. And why was that?

A. Because he told me he didn't remember the event and I couldn't evaluate his state of mind at the time of the event.

Q. So because he had amnesiatic [sic] about it . . .

A. He testified—he said he had blackouts, which we use the term amnesia.

Q. So you reviewed other things in relation to this case, though?

A. Yes.

Q. What all did you review? Offense reports?

A. I reviewed his medical records from the MHMR in Victoria. I reviewed the witness statements from the assault, I guess offense reports. I did review [the State's expert's] reports. There might be a few other things.

. . .

[DEFENSE]: Pass the witness.

Examining the trial court's decision in light of what was before the trial court at the time the decision was made, *see Weatherred*, 15 S.W.3d at 542, we cannot conclude that the trial court's decision to

sustain the State's objection regarding state-of-mind testimony was arbitrary, unreasonable, or without reference to guiding rules or principles. *See Mechler*, 153 S.W.3d at 439. Clearly, Dr. Demoor testified that he did not evaluate Engle's state of mind at the time of the event. Dr. Demoor explained that he could not testify regarding Engle's state of mind because Engle told him that he "didn't remember the event." It is apparent that the trial court understood that this testimony related to insanity due to a mental disease or defect or to insanity due to the involuntary intoxicant that caused the severe mental disease or defect. *See Mendenhall*, 77 S.W.3d at 818; *see also* Tex. Penal Code Ann. § 8.01(a). Based on Dr. Demoor's explicit testimony, the trial court sustained the State's objection that this expert had already testified he did not evaluate Engle for whether he knew that his conduct was wrong. *See Mendenhall*, 77 S.W.3d at 818. The trial court's decision to exclude any state-of-mind testimony from Dr. Demoor is reasonably supported by the record, especially in light of the expert's unequivocal testimony that Kyle "didn't remember the event" so he "couldn't evaluate his state of mind," and the trial court's reasoning as expressed to counsel outside the presence of the jury. *See Willover*, 70 S.W.3d at 845. The decision is correct based on a theory of law related to the admissibility of evidence. *See id.* We conclude that the trial court did not abuse its discretion in excluding Dr. Demoor's opinion testimony regarding Engle's state of mind. *See Shuffield*, 189 S.W.3d at 793.[3]

FN3

The State also objected to the following question Engle asked of Dr. Demoor: "And you said you didn't see any evidence of insanity because you couldn't talk to him directly about it. Were there other indications, though, that there's a possibility or probability that he could have been insane at the time of the alleged offense?" The trial court sustained the State's objection that Dr. Demoor had "already testified he did not evaluate for that." On appeal, Engle does not argue the appropriateness of the State's objection to his question regarding "other indications ... that he could have been insane" and does not challenge the trial court's ruling on this objection. So we do not address it. *See* Tex. R. App. P. 47.1.

2. The Trial Court Did Not Rule on the State's Relevancy Objection

Engle also asserts that the trial court erred in sustaining the State's relevancy objection to the following testimony provided by Dr. Demoor during his direct examination:

Q. Are you familiar with Lexapro?

A. Yes.

Q. What is Lexapro prescribed for?

A. It's prescribed for depression and anxiety.

Q. Was this a proper case to prescribe Lexapro for?

A. It's a debatable question. Lexapro is not approved for use in bipolar depression and in my opinion Mr. Engle suffers from bipolar disorder, as was the opinion of the doctor at MHMR, Dr. Dotter. Antidepressants are used at times in bipolar depression but they have to be [used] very cautiously, with very clear instructions to monitor for increasing agitation or irritability or aggression and to notify the doctor or to stop the medicine if that happens. That's my experience of using that type of medicine for bipolar depression.

Q. And so in using it for bipolar depression, in reviewing the—what all did you review in looking at . . .

[THE STATE]: Your Honor, I'm going to object. I don't think it's relevant. The only relevance of this witness's testimony has to do with the analysis for the issue of insanity, not for bipolar depression.

Although Engle contends that the trial court sustained the State's relevancy objection, we find nowhere in the record where the court expressly or impliedly adversely ruled on this objection. *See* Tex. R. App. P. 33.1; *see also* Tex. R. Evid. 401. After the State objected, the trial court excused the jury and addressed the State's challenge to Dr. Demoor state-of-mind testimony. Defense counsel simply chose not to continue questioning Dr. Demoor about the prescription medicine. So Engle has no basis for his complaint that "he was stopped from proving how Lexapro affects sufferers of bipolar disorder." *See* Tex. R. App. P. 33.1(a).

3. Determination
Having concluded that the trial court properly sustained the State's state-of-mind objection and that Engle has no basis for a complaint

> about the State's relevancy objection, we overrule Engle's sole
> appellate issue.

*Engle v. State,* No. 13–16–00270–CR (Tex. App. -- Corpus Christi-Edinburg [13 Dist.] 2017, pet. ref'd)(not designated for publication).

Under Texas law, insanity is a defense to prosecution if, "at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong". Tex. Penal Code Ann. § 8.01(a) (West Supp.1994). However, "[t]he term 'mental disease or defect' does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct". Tex. Penal Code Ann. § 8.01(b) (West 1974). "[N]either intoxication nor temporary insanity of mind produced by the recent voluntary use of alcohol constitutes a defense to the commission of a crime". *Craig v. State,* 594 S.W.2d 91, 96 (Tex. Crim. App. 1980). Evidence of temporary insanity caused by involuntary intoxication can be an affirmative defense to prosecution. Tex. Penal Code Ann. §§ 8.01(a), 8.02(a) (West 1993). However, involuntary intoxication is only a defense to criminal culpability when a defendant shows that he exercised no independent judgment or volition in taking the intoxicant and as a result he did not know that his conduct was wrong or was incapable of conforming his conduct. *Spriggs v. State,* 878 S.W.2d 646, 649 (Tex. App. - Corpus Christi 1994, no pet.), citing *Torres v. State,* 585 S.W.2d 746, 749 (Tex. Crim. App. 1979).

Engle could not show that he was harmed by this exclusion of evidence because while the charge did not include an instruction on insanity under section 8.01 of the Penal Code, it did include an instruction on insanity due to involuntary intoxication. The jury was instructed as follows:

> Now, if you find from the evidence beyond a reasonable doubt that or
> about August 19, 2014, in DeWitt County, Texas, the defendant,
> KIRK ROSS ENGLE, did intentionally or knowingly use a deadly
> weapon, to-wit: a knife, that in the manner of its use and intended use

was capable of causing death or serious bodily injury; and did then and there intentionally and knowingly cause bodily injury to Brian Smolik by stabbing the said Brian Smolik with said deadly weapon, as alleged in the indictment, you will find the defendant guilty of aggravated assault, as charged in the indictment.

Unless you so find from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty".

V.

It is an affirmative defense to prosecution that, at the time of the conduct charged, the defendant, as a result of severe mental disease or defect, did not know that his conduct was wrong. You are instructed that insanity caused by involuntary intoxication by prescription medication is a defense to prosecution for an offense when it is shown that the accused has exercised no independent judgment or volition in taking the intoxicant and, as a result of his intoxication, he did not know that his conduct was wrong.

Such a condition of the defendant must have existed at the very time of the alleged commission of the offense.

By the term intoxication is meant disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

The burden of proof is upon the defendant to prove this affirmative defense by preponderance of the evidence.
By the term preponderance of the evidence is meant the greater weight and degree of the credible evidence in this case.

VI.

Now, if you believe from the evidence beyond a reasonable doubt that on or about August 19, 2014, in DeWitt County, Texas, the defendant, KIRK ROSS ENGLE, did then and there intentionally or knowingly use a deadly weapon, to-wit: a knife, that in the manner of its use and intended use was capable of causing death or serious bodily injury; and did then and there intentionally and knowingly cause bodily injury to Brian Smolik by stabbing the said Brian Smolik with said deadly weapon, as alleged in the indictment, but you further find from the evidence by a preponderance of the evidence, that at such time the defendant was involuntarily intoxicated by prescription

> medication, and that he exercised no independent judgment or
> volition in taking the intoxicant, and that as a result of his
> intoxication he suffered a severe mental disease or defect and did not
> know that his conduct was wrong then you will acquit the defendant
> and say by your verdict "Not guilty by reason of insanity".

(Docket Entry No. 18-3, pp. 1-2).

The defense of involuntary intoxication is implicit in section 8.04 of the Penal Code. *See Mendenhall v. State,* 77 S.W.3d 815, 817-818 (Tex. Crim. App. 2002) (involuntary intoxication is an affirmative defense where defendant "as a result of a severe mental defect caused by involuntary intoxication, did not know that his conduct was wrong"). Here, Engle received an instruction that would have led to a finding of not guilty if it were proven. *See* Docket Entry No. 18-3, p. 4. Engle could not show that he was harmed by the exclusion of testimony concerning insanity when he did, in fact, receive an instruction based on involuntary intoxication.

At trial, Dr. Demoor testified that he did not evaluate Engle's sanity and "didn't see any evidence to support not guilty by reason of insanity. Dr. Demoor stated, in his opinion, that Engle "suffered from involuntary intoxication due to his medication and that led to a manic state that caused his aggressive outburst." When Dornburg then asked if that involuntary intoxication "lead to a state where he didn't know what he was doing was wrong?", the State objected, and the trial court sustained the objection. The trial court explained that since Dr. Demoor had not evaluated Engle for the loss of "awareness of right and wrong," he could not answer questions regarding Engle's appreciation of what was right or wrong.

Engle has failed to show that there was a reasonable probability that the verdict would have been different if the trial court had not limited the expert testimony of Dr. Demoor. Any such error was harmless under *Brecht v. Abrahamson,* 507 U.S. at 623 (federal habeas relief requires a showing

that a constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict."). There was overwhelming evidence against Engle. He has failed to raise an issue as to whether the trial court's decision to exclude the expert testimony of Dr. Demoor had an injurious effect or influence on the verdict. Engle's claim of trial court error lacks merit.

This Court's review in this case is governed by the deferential standard of AEDPA. The Thirteenth Court of Appeals concluded that the trial court did not abuse its discretion in excluding Dr. Demoor's opinion testimony regarding Engle's state of mind. Given the minimal probative value of Dr. Demoor's testimony on the issue of Engle's state of mind, this Court concludes that the Texas courts' denial of Engle's claim was not an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. Engle has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Engle is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d)(1).

## V. The Claim Based on Ineffective Assistance of Trial Counsel under *Strickland* (Ground 2)

Engle complains that trial counsel Dornburg failed to object to the prosecutor's comments on Engle's post-arrest silence.

The Court reviews Sixth Amendment claims concerning the alleged ineffective assistance of counsel ("IAC"), whether at trial or on direct appeal, under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Smith v. Robbins*, 528 U.S. 259, 285 (2000) ("the proper standard for evaluating [a] claim that appellate counsel was ineffective . . . is that enunciated in *Strickland*" (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986))).

Under *Strickland*, a habeas petitioner must demonstrate that the performance of his attorney fell below an objective standard of reasonableness, *see* 466 U.S. at 687-88. To be cognizable under *Strickland*, trial counsel's error must be "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687; *see also Buck v. Davis*, 580 U.S. ——, 137 S. Ct. 759, 775 (2017) (reaffirming that "[i]t is only when the lawyer's errors were 'so serious that counsel was not functioning as the "counsel" guaranteed . . . by the Sixth Amendment' that *Strickland*'s first prong is satisfied" (citation omitted)). The petitioner also must prove that he was prejudiced by his attorney's substandard performance. *See Strickland*, 466 U.S. at 687, 692. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. [B]ecause of the risk that hindsight bias will cloud a court's review of counsel's trial strategy, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Feldman v. Thaler*, 695 F.3d 372, 378 (5th Cir. 2012) (quoting *Strickland*, 466 U.S. at 689).

"A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Cotton v. Cockrell*, 343 F.3d 746, 752-53 (5th Cir. 2003). Moreover, "[j]ust as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington v. Richter*, 562 U.S. 86, 110 (2011). "The Supreme Court has admonished courts reviewing a state court's denial of habeas relief under

AEDPA that they are required not simply to give [the] attorney's[sic] the benefit of the doubt, . . . but to affirmatively entertain the range of possible reasons [petitioner's] counsel may have had for proceeding as they did." *Clark v. Thaler*, 673 F.3d 410, 421 (5th Cir. 2012) (internal quotation marks omitted). Therefore, on habeas review under AEDPA, "if there is any 'reasonable argument that counsel satisfied *Strickland*'s deferential standard,' the state court's denial must be upheld." *Rhoades v. Davis*, 852 F.3d 422, 432 (5th Cir. 2017) (quoting *Richter*, 562 U.S. at 105).

To demonstrate prejudice, a habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Thus, "the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Richter*, 562 U.S. at 111. "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different," which "does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters "only in the rarest case."" *Id.* at 111-12 (quoting *Strickland*, 466 U.S. at 693, 696, 697). "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

Ineffective assistance of counsel claims are considered mixed questions of law and fact and are therefore analyzed under the "unreasonable application" standard of 28 U.S.C. § 2254(d)(1). *See Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010). Where, as here, the state court adjudicated ineffective-assistance claims on the merits, this Court must review a habeas petitioner's claims under

the "doubly deferential" standards of both *Strickland* and Section 2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 190, 202 (2011); *see also Rhoades*, 852 F.3d at 434 ("Our federal habeas review of a state court's denial of an ineffective-assistance-of-counsel claim is 'doubly deferential' because we take a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." (citation omitted)).

In such cases, the "pivotal question" for this Court is not "whether defense counsel's performance fell below *Strickland*'s standard"; it is "whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101; *see also id.* at 105 ("Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." (internal quotation marks and citations omitted)). In other words, AEDPA does not permit a de novo review of state counsel's conduct in these claims under *Strickland. See id.* at 101-02. Instead, on federal habeas review of a claim that was fully adjudicated in state court, the state court's determination is granted "a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.* at 101; *see also Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam) (explaining that federal habeas review of ineffective-assistance-of-counsel claims is "doubly deferential" "because counsel is 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment'"; therefore, "federal courts are to afford 'both the state court and the defense attorney the benefit of the doubt'" (quoting *Burt*, 571 U.S. at 22, 15)); *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910-11 (11th Cir. 2011) ("Double deference is doubly difficult for a

petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.").

Engle argues that the remarks and the comments made by the prosecutor and its witness were designed to improperly override evidence that Engle was insane. *See* 3 RR 91, 4 RR 86-88, 5 RR 29. He asserts that the prosecutor verbally made the point that Engle was sane, while exercising his Fifth Amendment rights to remain silent. *Id.* Engle complains that these statements as a whole were both improper and prejudicial. *Id.* Engle states that the record shows that the prosecutor deliberately elicited testimony from Ranger Wilson that Engle invoked his constitutional rights to terminate the interview. Engle asserts that this line of questioning violated Engle's right to due process, and had an objection been made, the trial court would have been required to sustain it on that ground. Engle maintains that had Dornburg raised an objection, the trial court would have reprimanded the prosecutor and issued a prompt curative instruction to the jury. In turn, the jury would have heard from the judge that the prosecutor's comments called for an improper and impermissible negative inference for Engle's exercise of his Fifth Amendment rights. Engle asserts that if Dornburg had objected to the prosecutor's first statement, the prosecutor would not have been permitted to continue to overstep with the subsequent comments. On three occasions, the prosecutor alluded to Engle's silence and linked it to his insanity defense during closing arguments. Engle complains that because Dornburg failed to object or to move to strike, the trial judge was never requested to give curative instructions.

The record indicates that Texas Ranger Troy Wilson interviewed Engle after the stabbing. After being read his *Miranda* rights, Engle, according to Ranger Wilson, terminated the interview and walked out. *See* III RR 85, 87-88. A video recording of the interview was introduced at trial

over Dornburg's hearsay objection. *See* III RR 89-90. The recording indicated that Engle, in response to Ranger Wilson's admonition that he could "terminate the interview at any time," pleaded "the Fifth" and said he wanted to "terminate" the interview. *See* III RR 88, 91. Engle also nodded his head in response to the *Miranda* questions. *See* III RR 91. Dornburg did not cross-examine Ranger Wilson. *See* III RR 92. The State also asked Engle about his interview with Ranger Wilson on cross-examination. *See* IV RR 86-89. Dornburg lodged an objection, the basis of which is not in the record. *See* IV RR 88. The State referred to Engle's refusal to give a statement after being read his *Miranda* rights as evidence that Engle was not insane. *See* V RR 29.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." The privilege "permits a person to refuse to answer questions, in formal or informal proceedings, where the answers might be used to incriminate him in future criminal proceedings." *United States v. Ramos,* 685 F.3d 120, 126 (2d Cir. 2012). It also allows a person to express his desire to remain silent, or to remain silent until he has the assistance of an attorney. *Cf. Wainwright v. Greenfield,* 474 U.S. 284, 295 n.13 (1986) ("With respect to post-*Miranda* warnings 'silence,' we point out that silence does not mean only muteness; it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted.").

In order for the privilege to be given full effect, individuals must not be forced to choose between making potentially incriminating statements and being penalized for refusing to make them. Thus, in *Griffin v. California,* 380 U.S. 609, 613 (1965), the Supreme Court held that a prosecutor may not "tender[ ] to the jury for its consideration the failure of the accused to testify" as substantive evidence of guilt. "[T]he Fifth Amendment . . . forbids either comment by the prosecution on the

accused's silence or instructions by the court that such silence is evidence of guilt." *Id.* at 615; *see also Baxter v. Palmigiano,* 425 U.S. 308, 319 (1976) (noting that *Griffin* "prohibits the judge and prosecutor from suggesting to the jury that it may treat the defendant's silence as substantive evidence of guilt").

Eleven years after *Griffin*, the Supreme Court decided *Doyle v. Ohio,* 426 U.S. 610 (1976). In that case, two defendants were charged with selling marijuana to an informant. In their separate trials, each defendant took the stand and for the first time asserted that he was trying to buy, rather than sell, marijuana. To impeach them, the prosecutor brought out on their respective cross-examinations that neither defendant told that story to the police after he was arrested. The prosecutor also relied on the defendants' post-arrest silence in his closing arguments.

In considering the constitutionality of this practice, the Supreme Court first noted that the defendants had been given *Miranda* warnings when they were arrested and that those warnings implicitly assured them that their silence would carry no penalty. *Id.* at 618. The Court then concluded that "[i]n such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.*

Later, in *Wainwright v. Greenfield,* 474 U.S. 284 (1986), the Court found that the due process concerns recognized in *Doyle* were equally relevant when a defendant's post-arrest silence was used to respond to a defense theory, rather than to impeach the defendant. In *Wainwright,* the defendant presented an insanity defense, and the prosecution attempted to rebut that defense by showing that the defendant was of sound enough mind to exercise his right to remain silent after receiving

*Miranda* warnings. The Court held that this violated the defendant's right to due process as interpreted in *Doyle. Id.* at 295.

These cases reflect an important difference between the violation of due process recognized in *Doyle* and the violation of the Fifth Amendment privilege recognized in *Griffin.* Specifically, as the Court held in *Robinson,* prosecutors may use a defendant's silence to impeach him or to fairly respond to a defense theory without violating the Fifth Amendment privilege. However, due process generally prohibits prosecutors from using the fact that a defendant remained silent after receiving *Miranda* warnings, even if that fact is used for purposes of impeachment (as in *Doyle*) or in response to a defense theory (as in *Wainwright*).

Indeed, the Court has declined to find a violation of due process based on the mention of a defendant's silence after receiving *Miranda* warnings only where that silence "was not used against him within the meaning of *Doyle.*" *Greer v. Miller,* 483 U.S. 756, 764 n.5 (1987). Just as in *Doyle,* the defendant in *Greer* took the stand and presented an exculpatory story, and the prosecutor asked him why he had not told that story when he was arrested. However, in *Greer*, defense counsel immediately objected, and the court sustained the objection and later advised the jury that it should disregard any questions to which an objection was sustained. Moreover, the prosecutor asked no further questions on the subject, nor did he refer to the defendant's silence in his closing argument. The Court held that no due process violation occurred because the defendant's post-arrest silence "was not submitted to the jury as evidence from which it was allowed to draw any permissible inference." *Id.* at 764–65. However, commenting on a defendant's silence prior to receiving the *Miranda* warnings, even if post-arrest, is permissible for impeachment purposes. *Fletcher v. Weir*,

455 U.S. 603, 606–07 (1982) (*Doyle* does not prohibit the Government from commenting on a defendant's post-arrest, but pre-*Miranda* warnings, silence).

Plain error review applies because Engle did not object contemporaneously at trial. To show plain error, a defendant must show (1) a forfeited error, (2) that is clear or obvious, and (3) that affects his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). If he discharges that burden, this Court may exercise our discretion "to remedy the error . . . if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotation marks and citation omitted; brackets in original).

Even if there was a *Doyle* error, Engle has not demonstrated that it affected his substantial rights. In *United States v. Vargas*, the Fifth Circuit held that even if there had been a *Doyle* violation, the prosecution's comments were limited to a few moments during closing arguments and therefore did not affect the fundamental fairness of the trial where there was ample evidence for a conviction. 580 F.3d 274, 279 (5th Cir. 2009). And in *United States v. Salinas*, the Fifth Circuit affirmed the district court where the Government had introduced sufficient evidence to rebut the defendant's exculpatory story at trial, making any *Doyle* violation harmless. 480 F.3d 750, 760 (5th Cir. 2007). This Court concludes that Engle has not demonstrated that his substantial rights were affected by the *Doyle* violation as required under plain error review. *See Puckett*, 556 U.S. at 135.

Initially, the Court notes that insanity and involuntary intoxication are different defenses. There are two elements to insanity: (1) the actor did not know his conduct was wrong or illegal because of (2) a severe mental disease or defect. *See Mendenhall*, 77 S.W.3d at 817-818. Involuntary intoxication adds an element that is obviously not part of the insanity defense: (3) "intoxication." *See id.* at 817. The prosecutor in this case knew ahead of time that Engle was going

to claim "insanity by voluntary intoxication" and addressed it in voir dire. *See* II RR 98-100. Dornburg discussed the issue as well. *See* II RR 145-147, 149 ("Can someone be intoxicated from medication to the point, having their mental abilities to the point where they don't know what they're doing?"). The defense is also called "temporary insanity due to involuntary intoxication." *See Torres*, 585 S.W.2d at 748 (citing to *Hanks v. State,* 542 S.W.2d 413, 415-416 (Tex. Crim. App. 1976)).

Officer Wilson's testimony was not objectionable because it was intended to rebut the allegation that Engle was temporarily or involuntarily intoxicated. As set out in the statement of facts, the prosecution's strategy was to show that Engle was not intoxicated but cogent and communicative and that Lexapro had no effect on his conduct and demeanor. The testimony of police interaction with Engle shows that Officer Serbin said that Engle told police that he wanted to stab the fire chief and that he wanted to go "home," i.e. "the penitentiary." III RR 58-59. Engle corrected Officer Serbin after he misspelled his name as "Ingle." III RR 62. This is all caught on videotape, which also shows that in response to being told that police were going to get a warrant for his clothes, which had blood on them, Engle "said he was going to give them up voluntarily." *See* III RR 80. Engle laughed when Chief Campos told him that he was "going to go away for 25 years" and made the comment, "I'll be out in three months." *See* III RR 80. Engle also said that he was going crazy, asked to be executed, said that the victim was in the "wrong place at the wrong time," regretted not having been sent to the "crisis center," and wanted to be placed in "cell lockdown." III RR 82-83. Officer Wilson then followed Officer Serbin and said that Engle told him that he was on medication, that his counselors wanted him in prison, "that he had been in prison for 17-and-a-half years and it wasn't working for him and this is what it took." *See* II RR 87. Officer Wilson then read

Engle his *Miranda* rights, "the 38.22 warnings," and Engle indicated that he wanted to "plead the Fifth" and to "terminate" the interview. *See* III RR 90-91. Engle also nodded his head in the affirmative and indicated that "he understood the right." *See* III RR 91.

On cross-examination, the prosecutor asked Engle about his conduct and demeanor with Officer Wilson. *See* IV RR 83-87. The focus was on Engle's memory of the stabbing after taking his medication fourteen hours before. *See* IV RR 83-86. The prosecutor reminded Engle that he spoke with Officer Wilson, and in response to the *Miranda* warnings, Engle terminated the interview, "stood up and walked out." *See* IV RR 87. "It sounds as if you knew exactly what he was telling you in your warnings and you understood them and you chose to exercise one of your rights, doesn't it?" *See* IV RR 87. After the prosecutor repeated Engle's response, Dornburg objected. *See* IV RR 88. There is no indication in the record of what the objection was. *See* IV RR 88. The prosecutor asked Engle, "It also sounded like you remembered what happened that night, didn't it, based on what you told him? Right?" *See* IV RR 88.

The prosecutor also mentioned Engle's interview with Officer Wilson during his closing argument. *See* V RR 29. He argued that Engle was not in a blacked-out state sixteen hours after taking his medication. *See* V RR 29.

The record shows that Dornburg did not object during Officer Wilson's testimony. Nor did he object during closing argument. The record also does not show the basis of Dornburg's objection during Engle's cross-examination. It is possible that he found Officer Wilson's testimony unobjectionable under *Wainwright* since it was not directed at Engle's silence nor did it go to establish sanity but to establish Engle's sobriety and his demeanor. Through his questioning, the prosecutor sought to show that Engle was not in a blacked-out state following the ingestion of

Lexapro early that morning. Here, Engle nodded his head when asked if he understood his rights, then followed up with indicating that he wanted to "terminate" the interview and that he "pleaded the Fifth."

Strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. *Strickland*, at 690-91. Even if in retrospect the strategy to pursue one line of defense over another appears to have been wrong, the decision will be held ineffective only if it was so patently unreasonable that no competent attorney would have chosen it. *Adams v. Wainwright,* 709 F.2d 1443, 1445 (11th Cir. 1983), *cert. denied*, 464 U.S. 1063 (1984). Tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir.), *cert. denied,* 522 U.S. 944 (1997).

Dornburg made a strategic choice not to object to the prosecutor's comments on Engle's post-*Miranda* silence. Dornburg did not abdicate his responsibility to advocate his client's cause. *Cf. Nealy v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985)(reversing a murder conviction due to counsel's failure to investigate a viable alibi defense). Engle testified regarding the events on August 19, 2014, in a clear attempt to bolster the credibility of his involuntary intoxication defense. By doing so, he opened the door to the State's cross-examination concerning the truth of his testimony. *See U.S. v. Havens*, 446 U.S. 620, 626–27 (1980) ("It is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth.").

Respondent argues that the fact that Engle "pleaded the Fifth" is especially probative since there is nothing in the *Miranda* warnings or the warnings contained in article 38.22 of the Code of Criminal Procedure referencing the Fifth Amendment. *See Miranda,* 384 U.S. at 478-479; Tex. Code

Crim. Proc. art. 38.22, § 2(a) (West 2014). The Fifth-Amendment comment, in other words, showed a state of mind inconsistent with intoxication. The mental state of the defendant and circumstances of the crime are relevant in determining whether the defendant was insane at the time of the offense. *See Graham v. State,* 566 S.W.2d 941, 951 (Tex. Crim. App. 1978)(citations omitted).

Additionally, Engle cannot show that he was prejudiced by Dornburg's failure to object. There is no doubt that he stabbed the complainant, Smolik. The only issue was whether Engle was not guilty by reason of involuntary intoxication, an issue on which he had the burden. Engle testified that he had had mental problems, was taking Lexapro, and did not remember stabbing the complainant because of Lexapro. *See* IV RR 25-32, 71, 103. But all the testimony concerning Engle's responses to police officers at the scene and in the car on the way to jail show that he was not intoxicated or in a blacked-out state. While Dr. Demoor testified that he believed that Engle was involuntarily intoxicated, his testimony was not that persuasive given the dispute over whether he could testify as to Engle's sanity. *See* IV RR 122-124, 126-127. The State's witness, Dr. Kutnick, did not help develop the involuntary intoxication defense either. *See* IV RR 136. While Dr. Kutnick was not asked to examine Engle for involuntary intoxication, he did note that Engle had problems with rage and anger before he began taking Lexapro. *See* IV RR 139, 143-147. There was very little evidence that Engle was intoxicated when he stabbed Smolik. Dornburg's failures to lodge *Wainwright* objections did not prejudice Engle's defense.

Even assuming that the trial court committed *Doyle* error, such error was harmless. *See Brecht v. Abrahamson,* 507 U.S. 619, 622, 629 (1993) (*Doyle* error subject to harmless error analysis). There was no dispute that Engle stabbed Smolik. The prosecution's comments were limited to a few moments during trial and closing arguments and therefore did not affect the

fundamental fairness of the trial where there was ample evidence for a conviction. The State had introduced sufficient evidence to rebut Engle's exculpatory story at trial, i.e., that he was intoxicated, making any *Doyle* violation harmless. Dr. Thomas Demoor, the defense psychiatric expert, testified that in a forensic setting he had to use a little more of a skeptical eye and look for confirmatory evidence of what the person tells him. Dr. Joel Kutnick, the State's psychiatric expert, testified that in the forensic setting, it is necessary to determine if the patient is trying to deceive him. Thus, it is unlikely that the prosecutor's comments regarding Engle's silence had any substantial or injurious effect or influence on the jury's guilty verdict in this case.

Evidence that Engle chose to remain silent could not have affected the verdict. This fact also dooms Engle's companion ineffective assistance of counsel claim. Because any alleged error is harmless, Dornburg could not have been ineffective for failing to object to it. *See Lockhart v. Fretwell,* 506 U.S. 364, 374 (1993) (O'Connor, J., concurring) (failing to raise a meritless objection cannot constitute prejudice under a *Strickland v. Washington,* 466 U.S. 668, 687 (1984), ineffective assistance of counsel claim). Engle is therefore not entitled to relief on his *Doyle* error claim and related ineffective assistance claim.

This Court concludes that the Texas courts' denial of Engle's claim was not an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. Engle has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Engle is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d)(1).

## VI. The Claim Based on Ineffective Assistance of Trial Counsel Under *Cronic* (Ground 3)

Engle complains that the trial judge interfered in certain ways with the ability of counsel to make independent decisions about how to conduct the defense. Engle asserts that the prosecutor's obstructive tactics, the judge's ruling, and the State's repeated objections appreciably reduced the likelihood that Dornburg would conduct a vigorous defense. Engle is asserting that he was denied the effective assistance of counsel by the State, who used the judge to prevent him from defending against its case. The prosecutor went so far as to impede Engle's counsel's ability to cross-examine his expert witness. The circumstances surrounding Engle's counsel's representation of him – the prosecutor's repeated objections and the trial court's ruling – prevented Engle's counsel from assisting Engle during a critical stage of the proceeding. *See Cronic*, 466 U.S. at 659 (1984).

The Supreme Court's "decisions have emphasized that the Sixth Amendment right to counsel exists 'in order to protect the fundamental right to a *fair trial*.'" *Lockhart v. Fretwell*, 506 U.S. 364, 368 (1993) (quoting *Strickland*, 466 U.S. at 684) (emphasis added). Indeed, the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a *fair trial*. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. *Cronic*, 466 U.S. at 658 (emphasis added). To prevail on an ineffective assistance claim, the applicant ordinarily must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. On the other hand, "if counsel *entirely fails* to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659 (emphasis added).

In *Cronic*, the Supreme Court held that where "counsel entirely fails to subject the prosecution's case" to meaningful testing, "the adversary process itself [is] presumptively unreliable," and a defendant, therefore, need not demonstrate the impact of the failure in order to succeed on his claim. *Id.* at 658–59. The Supreme Court has described *Cronic* as "a narrow exception to *Strickland*'s holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

The Supreme Court has held that *Cronic* was inapplicable even where counsel failed to adduce mitigating evidence and waived closing argument, explaining, "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete." *See Bell v. Cone*, 535 U.S. 685, 696–97 (2002). Similarly, this Court held that *Cronic* was inapplicable where counsel conceded that a defendant committed murder, but not capital murder, over the defendant's objections, *Haynes v. Cain*, 298 F.3d 375, 381–82 (5th Cir. 2002) (en banc), explaining that "defense counsel must *entirely* fail to subject the prosecution's case to meaningful adversarial testing for the *Cronic* exception to apply," *id.* at 381 (citing *Gochicoa v. Johnson*, 238 F.3d 278, 285 (5th Cir. 2000)).

In *Florida v. Nixon*, the Supreme Court held that even defense counsel's full concession of guilt is not necessarily an indication that "counsel has entirely failed to function as the client's advocate," and that the *Strickland* standard applies to cases in which counsel informs the client of her strategic decision to concede guilt and focus on the penalty phase. *Nixon*, 543 U.S. at 189–91. *Nixon* suggests that most tactical decisions by counsel will be subject to the *Strickland* ineffective-assistance-of-counsel analysis, rather than the *Cronic* structural-error analysis, whether

or not they involve an admission of guilt. *Nixon* also suggests that the fact that a client has not approved of a strategy does not necessarily trigger the application of *Cronic*: "When counsel informs the defendant of the strategy counsel believe[d] to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding defendant's explicit consent." *Nixon*, 543 U.S. at 192.

In the instant case, the earlier, lengthy recitation of the procedural history and proceedings for Engle's trial demonstrates counsel did not "entirely fail to subject the prosecution's case to meaningful adversarial testing;" far from it. Among other things, he attempted pre-trial to suppress the evidence and Engle's statement, objected at trial to the admission of that statement, and cross-examined the State's witnesses. The evidence against Engle was strong, which necessarily limited the available defenses. And, as the Court noted in *Cronic,* "the Sixth Amendment does not require that counsel do what is impossible or unethical. If there is no bona fide defense to the charge, counsel cannot create one and may disserve the interests of his client by attempting a useless charade." *Cronic,* 466 U.S. at 656 n.19.

The Fifth Circuit drew the line between simple ineffective assistance requiring a showing of prejudice - the more typical case - and presumptive unreliability: bad lawyering, regardless of *how* bad, does not support the presumption; more is required. *See Woodard v. Collins,* 898 F.2d 1027 (5th Cir. 1990) (suggesting claim of no investigation by attorney would still require showing of actual prejudice). We must remember that we are addressing the case from hindsight, a luxury not available to an attorney developing trial strategies and making judgement calls prior to and at trial. The fact that another lawyer might have developed different strategies or made different calls itself does not necessarily show unfairness . . . . *McInerney v. Puckett,* 919 F.2d 350, 353 (5th Cir. 1990) (emphasis

in original); *see also Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998) (constructive denial of counsel under *Cronic* "is a very narrow exception to the *Strickland* prejudice requirement"); *Childress v. Johnson,* 103 F.3d 1221, 1229 (5th Cir. 1997) ("A constructive denial of counsel occurs . . . in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all.").

In sum, *Cronic* does not control. Remaining is the alternative conclusion that Engle is entitled to relief under *Strickland:* "counsel's performance was deficient," and "the deficient performance prejudiced the defense." *Strickland,* 466 U.S. at 687.

The restriction here involved preventing Dr. Demoor from testifying about Engle's insanity. But, as noted above, Dr. Demoor did not conduct a sanity examination. The trial court explained that since Dr. Demoor had not evaluated Engle for the loss of "awareness of right and wrong," he could not answer questions regarding Engle's appreciation of what was right or wrong. *See Engle,* 2017 WL 219119, at \*2; IV RR 125. The adjudication of this claim was not contrary to or an unreasonable application of *Cronic* or *Strickland.*

This Court concludes that the Texas courts' denial of Engle's claim was not an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. Engle has failed to show that the state court's decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Engle is not entitled to habeas relief on this claim. 28 U.S.C. § 2254(d)(1).

## VII. The Claim of Ineffective Assistance of Appellate Counsel

### (Ground 4)

Engle asserts that his appeal attorney was ineffective for failing to raise on appeal four improper comments on his exercise of his Fifth Amendment right to remain silent.

Persons convicted of a crime are entitled to effective assistance of counsel on direct appeal. *See Evitts v. Lucey,* 469 U.S. 387 (1985). This Court reviews counsel's appellate performance under *Strickland v. Washington,* 466 U.S. 668 (1984). *See Goodwin v. Johnson,* 132 F.3d 162, 170 (5th Cir. 1998). Engle must allege and present facts that, if proven, would show that his attorney's representation was deficient and that the deficient performance caused Engle prejudice. *See Strickland,* 466 U.S. at 687-88, 692; *Jones v. Jones,* 163 F.3d 285, 300 (5th Cir. 1998).

The first element requires Engle to show that his appellate counsel's conduct "fell below an objective standard of reasonableness." *United States v. Williamson,* 183 F.3d 458, 463 (5th Cir. 1999)(quoting *Strickland,* 466 U.S. at 688). This Court's review is deferential, presuming that "counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Effective assistance of appellate counsel does not mean counsel will raise every available nonfrivolous ground for appeal. *See Evitts,* 469 U.S. at 394; *West v. Johnson,* 92 F.3d 1385, 1396 (5th Cir. 1996). Rather, it means, as it does at trial, that counsel performs in a reasonably effective manner. *See Evitts,* 469 U.S. at 394.

In the appeals context, this means Engle must first show that his counsel failed to raise "a particular nonfrivolous issue" that "was clearly stronger than issues counsel did present." *Dorsey v. Stephens,* 720 F.3d 309, 320 (5th Cir. 2013) (quoting *Smith v. Robbins* 528 U.S. 259, 288 (2000)). Counsel is required to raise only "[s]olid, meritorious arguments based on directly controlling precedent." *Id.* (alteration in original) (quoting *United States v. Conley,* 349 F.3d 837, 841 (5th Cir. 2003)).

Engle must then show "a reasonable probability that, but for his counsel's unreasonable failure to [raise an issue], he would have prevailed on his appeal." *Id.* at 321 (alteration in original) (quoting *Smith*, 528 U.S. at 285). Effective appellate counsel should not raise every nonfrivolous argument on appeal, but rather only those arguments most likely to succeed. *Smith v. Murray,* 477 U.S. 527, 536 (1986); *Jones v. Barnes,* 463 U.S. 745, 751–753 (1983). A reasonable attorney has an obligation to research relevant facts and law and make informed decisions as to whether avenues will, or will not, prove fruitful. *See Strickland,* 466 U.S. at 690-91.

To show prejudice, Engle must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones,* 163 F.3d at 302 (quoting *Strickland,* 466 U.S. at 694). Such a reasonable probability makes the proceeding unfair or unreliable, so as to undermine confidence in the outcome. *Green v. Johnson,* 160 F.3d 1029, 1043 (5th Cir. 1998)(citing *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993)).

Engle maintains that his appellate attorney, Luis A. Martinez, was ineffective in failing to challenge the prosecutor's improper comments regarding his *post-Miranda* silence. As noted in Section V, supra, his trial attorney Dornburg failed to object to the references to his *post-Miranda* silence. Martinez raised one point of error on direct appeal challenging the limitation placed on Dr. Demoor's testimony. *See Engle,* 2017 WL 219119, at *1-3. "Declining to raise a claim on appeal is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *See Davila v. Davis,* 137 S. Ct. 2058, 2067 (2017) (citing *Smith,* 528 U.S. at 288). In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors. *See id.* (citing 2B. Means, Postconviction Remedies 35:19, p. 627, and n.16 (2016)).

Engle has failed to show that an unpreserved claim was "plainly stronger" than a preserved one. The adjudication of Engle's claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

There is no showing of a reasonable probability that, even assuming appellate counsel made unprofessional errors, the result of the proceeding would have been different but for such errors. *Wilson v. Cockrell*, 2003 WL 21672834, at *11 (5th Cir. July 17, 2003); *Duhamel v. Collins,* 955 F.2d 962, 965 (5th Cir. 1992). The state court's decision as to the effective assistance of appellate counsel reasonably applied the law to the facts, consistent with clearly established federal law. Engle has not shown a basis for the relief he seeks. 28 U.S.C. § 2254(d)(1).

## VIII. The Claim Based on Prosecutorial Misconduct

### (Ground 5)

Engle complains that during his jury trial, the prosecutor throughout the trial made improper references to his post-*Miranda* silence in violation of his constitutional right to remain silent. *See* 3 RR 91, 4 RR 86-88, & 5 RR 29. It is Engle's contention that because of the prosecutor's egregious acts of misconduct, he was denied a fair trial. Instead, the prosecutor, time and time again, made references to the fact that Engle had terminated the interview with Ranger Troy Wilson after he was advised of his *Miranda* rights and had remained silent on various occasions after being read his rights. Engle asserts that the prosecutor's clear intent was to persuade the jury that if Engle was insane, how would he have known to terminate his interview with Texas Ranger Troy Wilson and remain silent? *Id.* Engle complains that the prosecutor consistently and repeatedly sought to make impermissible references to Engle's silence after his arrest. Engle's silence was used as evidence during his trial to defeat his defense of not guilty by reason of insanity. However, by repeatedly

driving home references to Engle's silence and implying he understood his rights, the prosecutor crossed the line.

For purposes of determining whether there has been prosecutorial misconduct, the Supreme Court has stated that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). A trial is fundamentally unfair "if there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Riddle v. Cockrell,* 288 F.3d 713, 720 (5th Cir. 2002) (internal quotation marks omitted).

During his closing argument, the prosecutor argued:

> In November of 2013 there was an initial assessment at Gulf Bend. In that assessment the defendant stated that he had rage stage and that he would use it as an excuse to become violent. That's also State's Exhibit 7, admitted in evidence. The defendant knew his conduct was wrong. Fast forward to January 2014, where he meets with Mickey Kinney at Gulf Bend, where he says that he's homesick for prison. That's State's Exhibit 9. Fast forward again to July of 2014 where he's with Mickey Kinney again at Gulf Bend and he states that he wants to kill a cop and he also states that he has not been on Lexapro for at least two days. See State's Exhibits 8. One month later, August 19, 2014, which is the date of the offense in this case, the defendant starts a fire, he threatens a fireman, stating do you want to die tonight, then he stabs the fireman with a knife who is then hospitalized for four days. I believe the evidence shows that it was three days in the ICU.      Later on that same day, because he knew his conduct was wrong, he hides the knife so well that it's still never been recovered; however, y'all may remember we had multiple firemen testify that they saw the knife in Mr. Engles hand while he stabbed their friend, Brian Smolik, who is putting out a fire. Their testimony also showed that he left the scene of the crime because he knew his conduct was wrong. One hour later, after being apprehended by the Yorktown Police Department, during the ride to jail, admitted in State's Exhibit 4, he denied stabbing anybody and that's, again, evidence that he knew the

conduct was wrong. On the same ride to jail he also stated that the victim was in the wrong place at the wrong time and he apologized. That's also in State's Exhibit 4, which was the audio/video in the police vehicle. A few hours later, in the early hours of the morning while interviewed by the Texas Ranger, Troy Wilson, the defendant stated this is what it took, and he was referring to his plan to go back to prison. That's in State's Exhibit 5.

THE COURT: Thirty seconds.

MR. MANNING: Yesterday you heard Mickey Kinney say that he met with Mr. Engle about every week for about a year and never once did he complain about his medications. You also heard yesterday the Defense expert testify that he did not see any evidence to support not guilty by reason of insanity. And then you heard the court-appointed expert, Dr. Kutnick, say that the defendant does not meet the criteria for insanity.

. . .

You are instructed that insanity caused by involuntary intoxication by prescription medication is a defense to prosecution for an offense when it is shown that the accused has exercised no independent judgment or volition in taking the intoxicant and, and that's the critical word, and as a result of his intoxication he did not know that his conduct was wrong. That's the critical element and that is the element that has been wholly unproved by the Defense and, in fact, the converse has been proven emphatically by the State. He absolutely knew what he did was wrong. So if you believe at the end of the day that he's got mental illness, that's fine. I think he does. If you believe at the end of the day that he was intoxicated, I don't think the evidence shows that at all. But even if you believe it, that's fine, too, because that's not the issue. Those are red herrings. The question is was that mental illness an intoxication to the degree that stabbing a human being is the same as drinking a cup of coffee, that's what that means. And that's what Dr. Kutnick was explaining. You know, the guy shoots a guy and sits there and finishes his coffee because he did a good thing, he didn't know what he did was wrong. He's talking about a case where he believed insanity probably really was raised by the facts. And that's the way you behave when you're truly insane, because you don't know what you did was right or wrong. In this case, of course, the evidence is overwhelming that he knew what he did was wrong, and we're going to talk about that a little bit more.

. . .

This defendant starts a fire to attract the police. Fire Department gets there first, they start putting the fire out. He threatens them, don't put

that fire out, asked them if they want to die tonight. Why is he angry? Because they're putting out the fire that he wants to attract Campos to the scene. He stabs a fireman to get him to stop putting the fire out. He threatens other firemen with a knife. He turns and runs, hides his weapon, expresses no surprise at being arrested, and after he is arrested he explains that he had been telling people he wanted to go back to the pen and nobody would listen and this is what it took. In those words this is what it took. That tells you everything you need to know. That statement that he made to Texas Ranger Troy Wilson tells you everything. This is what it took. It tells you what his mindset was, it tells you what the plan was, it tells you what the motive was, it tells you everything. Then you go back through the records with Gulf Bend and you realize he's been talking about going back to prison for almost a year at the time he stabs Brian Smolik, way before he's ever on Lexapro, way before he's ever on Lexapro. He's missing prison, he wants to go back to prison. Before he's on Lexapro, as Mr. Manning pointed out, I think it was November of 2013, he's not on Lexapro until sometime in March, he's being obsessed and he tells them, he says -- he says to Gulf Bend I use rage stage as an excuse to get violent. Okay? Those are his words. It's not my words, it's not Gulf Bend's words, that's Kirk Engles words, I use rage stage as an excuse to become violent three, four months before he's ever put on Lexapro. In July when he's talking about killing a police officer he hadn't been on Lexapro for two days. He never complained about Lexapro, never told anybody there were any of these effects he's complained of and none of his descriptions of his life and none of the witnesses' descriptions of his life describe any kind of that degree of craziness that he wants you to believe that he suffered. His mother said he cried a lot, you know, he wasn't having rage attacks, he wasn't killing people. Lexapro had nothing to do with this. This is just the pattern of Mr. Engle's life, it is the pattern of his life. And especially with public servants, it's just the way it is. He's been twice before for attacking public servants. He wasn't on Lexapro then. He tells you he just fell over on a female officer. Well, you know what? You don't go to prison for accidentally falling over on female officers. It's a sad life but that's not a defense. So let's talk about Mr. Engle very briefly. The Defense puts on Mr. Engle and he talks about the life he's had. And it's a sympathetic story and I think some of it, if not most of it, is probably true. I think he had a bad life. I think there's no doubt he's had a bad life. And that's a sad and unfortunate thing. But what I don't think any reasonable juror can believe from his testimony is that he remembers everything from the morning that he attacked Brian Smolik from the morning and from the afternoon up until he sees the

flames and then forgets. That's just selective memory, because that's when he starts doing bad stuff. He remembers everything up to the point that he starts committing crimes and then he conveniently blacks out. Well, that's an absurdity. That's an excuse. That's nonsense. You know, I remember getting up, I remember taking my pills, I remember going to Carlos Villarreal's and I remember not drinking beer. How about that one? He specifically recalls that. But we know that's garbage. Carlos Villarreal is that nasty little guy that's yelling at the police on that video, the F U, he's yelling at Campos the whole time Campos is out there in the yard. He's the one who told the officers, yeah, he drank beer. That's his buddy. He doesn't have any reason to lie about that. Of course he drank beer. And what does he tell you he remembers? Yeah, they came over and started drinking beer, sure enough. Sure enough, but that's when I left. Now, that's what you're supposed to believe. Well, we know that's not what happened. In fact, I suspect the evidence suggests very strongly that probably part and parcel of this assault is whatever drinking this defendant chose to do that day. And that's not a defense. But this memory up until the fire, now we're talking hours after the alleged ingestion of Lexapro. Don't get me wrong, I mean the evidence proves, it shows you all that Lexipro stuff is just garbage to begin with, I mean it's just nonsense, it's not true. But if you think there's anything to it, bear in mind that this assault on Brian Smolik comes at 8:30, 9:00 in the evening. He took that pill in the morning. When he's talking to Ranger Troy Wilson it's at 2:30 in the morning. Assuming he took the pill when he woke up, whenever that was, that's hours and hours and hours and hours later. There's no blackout then. There's no telling Troy Wilson I don't remember, everything is black, you know, I don't know. He knew exactly what happened. And what did he tell you? He said, look, I've been on meds and I've been telling people I can't make it out here and this is what it took. This is what it took. I had to stab a guy to get back in the pen. You guys wouldn't listen to me, this is what it took, you know, sorry. Well, Troy says, okay, well, let me give you your rights and let's see, you know, let's talk about it some more and he goes you have the right to terminate your interview. What does he say? He says terminate, stands up and walks out. Now, that doesn't sound like an insane person to me.

(Docket Entry No. 18-26, pp. 5-29).

The record shows that the prosecutor was not trying to prove Engle's guilt by referring to his *post-Miranda* silence but to his demeanor and his responsiveness and his lack of intoxication. Engle

was asserting a defense on which he had the burden of proof. He was claiming he stabbed the victim while he was under the influence of an intoxicant. The issue of the stabbing was settled. In fact, Dornburg noted that the defense did not contest the stabbing and that Engle had apologized for the stabbing. The prosecutor pointed to Engle's responses which showed that Engle was not intoxicated at the time he stabbed Smolik. Additionally, Engle cannot show that he was harmed by the prosecutor's alleged mistakes. Dr. Demoor's testimony was not at all convincing. The State was able to prove that Engle committed a premeditated act and was alert and cogent at the time of the offense and soon thereafter. According to Dr. Kutnick, Engle had feelings of rage before he began taking Lexapro. *See* IV RR 143-147. So, any references to Engle's *post-Miranda* silence did not prejudice his ability to prove up his defense. There really was no defense. Accordingly, the state court's decision was a reasonable application of the law to the facts and was not contrary to clearly-established federal law as determined by the Supreme Court of the United States. Relief cannot be granted under 28 U.S.C. § 2254(d)(1).

Engle is not entitled to federal habeas corpus relief on this claim.

## IX.    Request for an Evidentiary Hearing

Engle requests an evidentiary hearing in this case. Section 2254(e)(2) provides:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that-
> (A) the claim relies on-
> (I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.*

The decision whether to conduct an evidentiary hearing is committed to this Court's discretion. *See Williams v. Taylor,* 529 U.S. 420, 436 (2000) (stating that it was "Congress' intent to avoid unneeded evidentiary hearings in federal habeas corpus" proceedings); *Conner v. Quarterman,* 477 F.3d 287, 293 (5th Cir. 2007)(citing *Roberts v. Dretke,* 381 F.3d 491, 497 (5th Cir. 2004) (citation omitted)); *McDonald v. Johnson,* 139 F.3d 1056, 1060 (5th Cir. 1998).

Where there is a factual dispute that, if resolved in the petitioner's favor, would entitle him to relief, and the State has not afforded the petitioner a full and fair hearing, a federal habeas corpus petitioner is entitled to an evidentiary hearing. *Clark v. Johnson,* 202 F.3d 760, 766 (5th Cir. 2000); *Perillo v. Johnson*, 79 F.3d 441, 444 (5th Cir. 1996). However, a petitioner is not entitled to an evidentiary hearing "if his claims are merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." *Young v. Herring*, 938 F.2d 543, 559 (5th Cir. 1991). "If it appears that an evidentiary hearing is not required, the judge shall make such disposition of the petition as justice shall require." Rule 8 of the Rules Governing Section 2254 Cases.

This Court has been able to resolve all issues raised in this case based on the pleadings and state-court records. As already discussed, the facts and claims Engle seeks to develop lack merit. Engle has failed to provide a factual basis for granting an evidentiary hearing. This Court determines that an evidentiary hearing is not required because there are no relevant factual disputes that would

require development in order to assess the claims. *Robinson v. Johnson*, 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied*, 526 U.S. 1100 (1999).

Engle argues there should be no presumption of correctness or deference given to the state court's findings because the state habeas judge did not conduct a hearing. A state court's factual determinations are entitled to a presumption of correctness under § 2254(e)(1), regardless of whether the state habeas court held a live evidentiary hearing, versus a paper hearing, or whether the state habeas judge was the same judge who presided at trial. *See Morrow v. Dretke*, 367 F.3d 309, 315 (5th Cir. 2004); *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. 2001); *Carter v. Johnson*, 131 F.3d 452, 460 n.13 (5th Cir. 1997); *Hudson v. Quarterman*, 273 F. App'x 331, 2008 WL 1708998 (5th Cir. 2008); *Bass v. Dretke*, 82 F. App'x 351, 2003 WL 22697282, at *3 (5th Cir. 2003). The AEDPA's deferential scheme is mandatory and applies to all claims adjudicated on the merits in state court. *Valdez*, 274 F.3d at 950. In *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997), in addressing whether the applicant's subsequent petitions were barred under Article 11.07, Section 4, of the Texas Code of Criminal Procedure, the Texas Court of Criminal Appeals determined that "a denial' signifies that we addressed and rejected the merits of a particular claim while a 'dismissal' means that we declined to consider the claim for reasons unrelated to the claim's merits."

Even if this Court did not presume the correctness of the state habeas court's findings, the Texas Court of Criminal Appeals presumably applied correct standards of federal law and made findings consistent with its decision. The Supreme Court has established that a state court's failure to make explicit findings of fact does not affect the deference a court must accord the state court's determination. *See Harrington v. Richter*, 562 U.S. 86, 98 (2011)("[D]etermining whether a state

court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning." (citations omitted)). *See also Amos v. Thornton*, 646 F.3d 199, 205 (5th Cir. 2011) (per curium) (finding that deference to the state court is not diminished when the state court "did not explain the reasons for its determination").

Engle's request for an evidentiary hearing is DENIED.

## X. Conclusion

Respondent's Motion for Summary Judgment is GRANTED. Engle's petition for a writ of habeas corpus is DENIED. This case is DISMISSED. Engle's motion for evidentiary hearing and appointment of counsel are DENIED as moot. Any remaining pending motions are DENIED as moot.

The Supreme Court has stated that the showing necessary for a Certificate of Appealability is a substantial showing of the denial of a constitutional right. *Hernandez v. Johnson,* 213 F.3d 243, 248 (5th Cir. 2000) (citing *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000)). Under that standard, an applicant makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further. *See Clark v. Johnson,* 202 F.3d 760, 763 (5th Cir. 2000). Where a district court has rejected a prisoner's constitutional claims on the merits, the applicant must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack,* 529 U.S. 484.

This Court denies Engle's petition after careful consideration of the merits of his constitutional claims. This Court denies a COA because Engle has not made the necessary showing for issuance. Accordingly, a certificate of appealability is DENIED.

SIGNED at Victoria, Texas, on _March 28_, 2019.

KENNETH M. HOYT
UNITED STATES DISTRICT JUDGE